**SCHERING CORPORATION, Plaintiff,**

v.

**The HOME INSURANCE COMPANY, Defendant.**

**No. 79 CV 2817.**

United States District Court,
E. D. New York.

Aug. 2, 1982.

---

Winthrop, Stimson, Putnam & Roberts by
Edwin J. Wesely, Eloise L. Morgan, J. Kord
Lagemann and Virginia G. Shubert, New
York City, for plaintiff.

Skadden, Arps, Slate, Meagher & Flom, by William R. Meagher, Barry H. Garfinkel, Sheila L. Birnbaum, Diane S. Wilner, George Zimmerman and Barbara Wrubel, New York City, for defendant.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This diversity action seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, to construe the coverage of excess liability insurance policies issued to plaintiff drug manufacturer ("Schering") by defendant insurance company ("Home"). Schering initiated the instant motion for summary judgment pursuant to Rule 56(a), F.R. Civ.P., seeking a determination of Home's contractual obligation to indemnify Schering for certain personal injury claims allegedly arising out of exposure *in utero* to dienestrol, a synthetic estrogenic substance.[1] Home vigorously opposed the motion, contending that the conflicting positions of the parties as to the intent and application of the insurance policies' coverage provision raise genuine issues of fact and that coverage under the policies cannot be determined absent factual resolution of the etiology and nature of dienestrol-related injury.[2]

Two months later, despite its prior position, Home instituted a cross-motion for summary judgment in its favor, F.R.Civ.P. 56(b), asserting that the claimed dienestrol-related injuries indisputably occurred contemporaneously with maternal ingestion during pregnancy, before the Home policies were issued to Schering. In opposition, Schering urged application of *contra proferentum* and successfully disputed Home's medical evidence while simultaneously arguing its irrelevancy. In the subsequent months, voluminous letters from the parties afforded the Court immediate notice of recent decisions construing comprehensive general liability ("CGL") policies similar to those presently at issue, in the context of asbestos-related personal injury claims. Finally, in June 1982, purporting to synthesize the fragmented submissions, Schering submitted a "summary memorandum," in which it primarily endeavors to persuade the Court to adopt the expansive principles articulated in *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). Now resisting summary judgment, Home has silently withdrawn its cross-motion by positing triable issues regarding Schering's reasonable ex-

1. Dienestrol is a crystalline estrogenic diphenol used medically for estrogenic hormone therapy from the late 1940's to the early 1970's.

2. In 1971, an article published in the New England Journal of Medicine reported an increased risk of vaginal adenocarcinoma in daughters of women who ingested diethylstilbestrol ("DES"), a synthetic estrogen compound derived from stilbene and pharmacologically similar to dienestrol, during pregnancy. Herbst, Ulfelder & Poskanzer, "Adenocarcinoma of the Vagina," 284 New England J.Med. 878 (Apr. 22, 1971), reprinted in Affidavit of Dr. Ervin Adam, Exh. 2. The authors of the article found a high correlation between maternal ingestion of DES during pregnancy and the development years later of cancer in the offspring exposed. Subsequent studies report similar associations between exposure to DES in utero and vaginal adenosis at birth (the abnormal presence of glandular tissue or cells), cervical cancer and incomplete development of the female reproductive system. Affidavit of Dr. Ervin Adam, Exh. 4, 7, 8; Affidavit of Dr. Lorna D. Johnson, Exh. 1.

Because of the pharmacological similarity and prescribed use of DES and dienestrol, it appears that dienestrol-related injuries may encompass any or all of the harms associated with DES exposure, including any attendant mental anguish, shock or humiliation. However, the factual issues of the nature and timing of dienestrol-related injury, properly the subject of adjudication of individual claims against Schering, are not before the Court on the instant motion.

Significantly, the Court has not been presented with facts of specific claims from which the date of injury can be determined. Instead, it is undisputed that certain dienestrol-related claims have been made against Schering and that Home has denied indemnification on the ground that the claimed injuries "resulted", under the terms of its policies' coverage provision, prior to its policy period. Construction of the coverage provision will clarify the insurer's obligation and establish the groundwork for future resolution of individual claims.

pectations of coverage and contending that the coverage dispute requires development of a factual framework grounded upon medical and scientific data.

The parties brilliant but somewhat obfuscatory efforts notwithstanding, the Court finds this controversy readily resolvable by straightforward application of fundamental legal principles. Consideration of medical evidence is not a necessary predicate to interpretation of the coverage provision in Home's policies. From August 30, 1966 to February 7, 1976,[3] Home agreed to indemnify Schering for losses sustained on account of personal injuries caused by or arising out of each event which "results in personal injury . . . during the policy period." For the reasons which follow, the Court holds that personal injury "results" when it originates and when the individual claimant receives actual notice of the harm. Thus, either the inception or the claimant's discovery of personal injury triggers coverage under the policies at issue.

The material uncontroverted facts are as follows. Schering is a pharmaceutical company which manufactured and distributed dienestrol either directly or through a subsidiary from 1958 to 1971. Dienestrol was used therapeutically in support of high-risk pregnancies, primarily to prevent miscarriage, from the late 1940's to the early 1970's. Such therapy was discontinued when the federal Food and Drug Administration ("FDA") proscribed production of dienestrol for administration to pregnant women in 1971. Subsequent to the FDA ban, several product liability claims for alleged dienestrol-related injuries were brought against Schering. In the course of defending against these claims, Schering

has incurred defense costs, entered into several settlements and had one judgment entered against it. In 1979, Schering settled an action involving a dienestrol-related injury that became manifest in 1974. Advised that the settlement had exhausted its $1,000,000 primary coverage for the year 1974, Schering requesting indemnification from Home for defense of certain outstanding 1974 claims. Affidavit of Spencer J. Rankin, Exhs. A, B. Reserving its rights relating to the issue of coverage, Home responded by contesting exhaustion of the aggregate limit in the underlying insurance policy and stating its interpretation of the coverage provision: Home's obligation to defend or indemnify Schering for dienestrol-related injuries does not arise when exposure to dienestrol occurred outside Home's policy period. *Id.*, Exhs. C, D, E. Schering has paid over $1,000,000 in premiums to Home in consideration of insurance coverage from August 30, 1966 to February 7, 1977.

Home's insurance policies state, in pertinent part:

"I. COVERAGE

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability

(a) imposed upon the Insured by law, or

(b) assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured, while acting in his capacity as such,

---

**3.** Since the parties' insurance agreement effective February 7, 1977 expressly excluded liability for personal injuries arising out of the manufacture, sale or use of dienestrol, coverage after that date is not at issue. However, the parties dispute the meaning of the exclusion in the policy covering the period from February 7, 1976 to February 7, 1977, which states as follows:

"In consideration of the premium charged, it is agreed that this policy shall not apply to any liability arising out of the manufacturing,

handling, distributing or selling for consumption of any drug, which is a chemical derivative of stilbene, known as diesthystilbestral [sic] or DES, or any derivative thereof." Policy No. HEC 9345919, Endorsement No. 7, Stipulation and Order filed May 6, 1980, Exh. A.

Absent pharmacological data, it is impossible to determine whether dienestrol is a derivative of either DES or stilbene and therefore excluded from coverage after February 7, 1976.

for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of:—

(i) Personal injuries, including death at any time resulting therefrom,

\*    \*    \*    \*    \*    \*

caused by or arising out of each occurrence happening anywhere in the world.

\*    \*    \*    \*    \*    \*

THIS POLICY IS SUBJECT TO THE FOLLOWING DEFINITIONS:

\*    \*    \*    \*    \*    \*

2. PERSONAL INJURIES

The term 'Personal Injuries' wherever used herein means bodily injury, mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination (except where it is a violation of a statute or regulation prohibiting such), humiliation; also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any Advertising activities.

\*    \*    \*    \*    \*    \*

5. OCCURRENCE

The term 'occurrence' wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury . . . during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

6. ULTIMATE NET LOSS

The term 'Ultimate Net Loss' shall mean the total sum which the Insured, or any company as his insurer, or both, become obligated to pay by reason of personal injury . . . claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators

and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Insured's or of any underlying insurer's permanent employees."

By their terms, the policies cover Schering's excess liability for personal injuries "caused by or arising out of each occurrence." The contractual definition of "occurrence", then, which essentially adopts the text of the standard CGL policy drafted in 1966 by the Mutual Insurance Rating Bureau and the National Bureau of Casualty Underwriters, is at the heart of this litigation. The parties do not dispute and there can be no question that the occurrence clause requires indemnification when personal injury—not the causative event— "results" during the policy period. Therefore, prenatal exposure to dienestrol, the event from which dienestrol-related injury necessarily arises, cannot trigger coverage under Home's policies. Rather, to activate Home's contractual obligation, an injury must be caused by or arise from exposure.

In this regard, the Court finds inapposite decisions construing CGL policies in the context of asbestos-related diseases. See, e.g., *Eagle-Picher Indus., Inc. v. Liberty Mut. Life Ins. Co.*, 682 F.2d 12 (1st Cir. 1982); *Keene Corp. v. Insurance Co. of N. Am., supra; Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 686, 71 L.Ed.2d 650 (1981). These cases were decided after presentation of extensive medical evidence on the pathogenesis of asbestos-related diseases, and the decisions were based on findings that such diseases involve a progressive injurious process resulting from repeated exposures to asbestos over typically long periods of time. In contrast, no such determination can be made in this case because no evidence has been presented on the nature of

the claimed personal injuries allegedly resulting from prenatal exposure to dienestrol. Yet it is not subject to dispute that the entire ingestion of dienestrol occurs during pregnancy, so that none of the problems attending lengthy and repeated exposures to a noxious substance exist.

The precise nature of dienestrol-related diseases, bodily conditions and emotional harm is not at issue in this litigation. Published medical studies illustrate statistical correlations between hormonal therapy during pregnancy and a wide spectrum of personal injuries resulting in the offspring exposed, from which the parties may anticipate the types of claims which will be brought against Schering. However, disputes over when a particular claimed injury occurs must be resolved on a case-by-case basis.

■ Before turning to interpretation of the policy language, we note first our obligation under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to apply the substantive law of New York. Under New York conflict of laws principles, *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the traditional rule is that construction of a contract is governed by the law of the place where the contract is made. *Swift & Co. v. Bankers Trust Co.*, 280 N.Y. 135, 141, 19 N.E.2d 992, 995 (1939). However, "the rule which has evolved clearly in [the] most recent decisions is that the law of the jurisdiction having the greatest interest in the litigation will be applied." *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968). Since the policies were issued and signed in New York, and Home has its principal place of business in New York, and no other State appears to have a greater interest in the outcome of the litigation, New York law controls interpretation of the insurance agreements before the Court.

Only one New York decision addresses interpretation of the standard CGL policy occurrence clause in the context of claims involving exposure to synthetic estrogens in utero, *American Motorists Ins. Co. v. E. R.*

*Squibb & Sons, Inc.*, 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup.Ct.1978) ("*AMICO*"). As stated by Justice Frankfurter, a dearth of controlling State law creates difficulties under the *Erie* doctrine:

"One of the difficulties, of course, resulting from *Erie R. Co. v. Tompkins*, is that it is not always easy and sometimes difficult to ascertain what the governing state law is. The essence of the doctrine of that case is that the difficulties of ascertaining state law are fraught with less mischief than disregard of the basic nature of diversity jurisdiction, namely, the enforcement of state-created rights and state policies going to the heart of those rights.... As long as there is diversity jurisdiction, 'estimates' are necessarily often all that federal courts can make in ascertaining what the state court would rule to be its law."

*Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 208–09, 76 S.Ct. 273, 279, 100 L.Ed. 199 (1956) (Frankfurter, J., concurring) (footnote omitted). See also, *King v. Order of Travelers*, 333 U.S. 153, 160–61, 68 S.Ct. 488, 492, 92 L.Ed. 608 (1948).

Similarly, in *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), the Court held that where no decision by a State's highest court exists with respect to characterization of a property interest for purposes of estate tax liability, federal courts must apply "what they find to be the state law":

"This is but an application of the rule of *Erie R. Co. v. Tompkins, supra*, where state law as announced by the highest court of the State is to be followed. This is not a diversity case but the same principle may be applied for the same reasons, *viz.*, the underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court. *Bern-*

hardt v. Polygraphic Co., 350 U.S. 198 [76 S.Ct. 273, 100 L.Ed. 199] (1956)." *Id.* at 465, 87 S.Ct. at 1782.

In the Second Circuit, the Court of Appeals has expressed its "established position" as follows:

"[W]hen a federal court must determine state law, it should not slavishly follow lower or even upper court decisions but ought to consider all the data the highest court of the state would use. See Corbin, The Laws of the Several States, 50 Yale L.J. 762 (1941). Such is the established position of this court."

*Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 851 (2d Cir. 1967) (on petition for rehearing) (*per curiam*).

In light of the foregoing authority, the Court is faced with the difficult task of determining State law without the benefit of controlling appellate decisions. In such circumstances, the first step in analysis will be to look to the lower court decision which enforced rights extremely similar to those presently at issue. While not dispositive, *AMICO* remains the sole declaration of New York public policy regarding the CGL occurrence clause in the synthetic estrogen context. The next step will be to apply well-established principles of State law regarding contract interpretation in an attempt to "estimate" the manner in which the New York Court of Appeals would respond to identical issues.

At issue in *AMICO* was coverage under an insurance agreement, similar to the ones presently in question, which contained the following definition of "occurrence":

"An accident or injurious exposure to conditions which results, during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." 95 Misc.2d at 223, 406 N.Y.S.2d at 659.

The impetus of the action was personal injury claims previously brought against the defendant, E. R. Squibb & Sons, a manufacturer of diethylstilbestrol ("DES"), see note 2, by female plaintiffs born between 1952 and 1961, who alleged that they developed cervical cancer as a result of their mothers' ingestion of DES during pregnancy, and that they discovered their conditions in 1970, 1971 and 1975 respectively. The action in *AMICO* was instituted by Squibb's insurer who sought a declaratory judgment construing the insurance agreement which, as in the instant action, was not yet in force when the drug was ingested. Both parties moved for summary judgment, and the issue before the court was whether the occurrence clause required "coverage for injuries caused by a drug which was ingested well before AMICO came on the risk in 1968," but which injuries were allegedly "discovered for the first time subsequent to 1968 when the policy was in effect." 95 Misc.2d at 223, 406 N.Y.S.2d at 659.

Holding that "liability coverage exists with respect to the claims ... which allegedly manifested themselves for the first time during the [policy] period," 95 Misc.2d at 226, 406 N.Y.S.2d at 661, the court analyzed the policy language as follows:

"The policy language does not limit coverage to incidents of exposure during the policy period, but rather to conditions which result in bodily injury during the policy period. A reading of the policy language would appear to indicate that coverage is predicated not on the act which might give rise to ultimate liability, but upon the result.... It is the *result* which is keyed to the policy period, and not the accident or exposure." 95 Misc.2d at 223–24, 406 N.Y.S.2d at 659–60 (emphasis in original).

Thus, as a point of departure, *AMICO* establishes that interpretation of the standard occurrence clause in the context of DES-related injuries must focus on the resulting harm, rather than exposure, as the trigger of coverage. Turning to analysis of the relevant State law, it is established in New York that "[r]ules for the construction of contracts of insurance do not differ from those applied to the construction of other contracts," *McGrail v. Equitable Life Assur. Soc.*, 292 N.Y. 419, 424, 55 N.E.2d 483, 486 (1944), including the well-accepted rule that ambiguity must be resolved against the drafter. *Greaves v. Public Serv. Mut. Ins.*

*Co.*, 5 N.Y.2d 120, 181 N.Y.S.2d 489, 155 N.E.2d 390 (1959). Thus, New York decisions comport with the "hornbook rule that policies of insurance . . . are to be liberally construed in favor of the insured," *Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 678, 389 N.Y.S.2d 565, 567, 358 N.E.2d 258, 260 (1976), and recognize that "[a] construction favorable to the insurer will only be sustained where it is the sole construction which can fairly be placed upon the words employed." *Cantanucci v. Reliance Ins. Co.*, 43 App.Div.2d 622, 623, 349 N.Y.S.2d 187, 191 (3rd Dep't 1973), *aff'd mem.*, 35 N.Y.2d 890, 364 N.Y.S.2d 890, 324 N.E.2d 360 (1974). The New York Court of Appeals has expressed the relevant principles as follows:

"But insurance contracts, above all others, should be clear and explicit in their terms. They should not be couched in language as to the construction of which lawyers and courts may honestly differ. In a word, they should be so plain and unambiguous that men of average intelligence who invest in these contracts may know and understand their meaning and import." *Janneck v. Metropolitan Life Ins. Co.*, 162 N.Y. 574, 577–578, 57 N.E. 182, 183. 'The question is simply whether the average man in applying for insurance and reading the language of this policy at the time it was written would ascribe the meaning to that language which the insurance company here urges.' *Hartol Products Corp. v. Prudential Ins. Co. of America*, 290 N.Y. 44, 50, 47 N.E.2d 687, 691. It is not enough if the applicant might have so construed it, provided it could reasonably be construed otherwise. To sustain the construction urged, the insurer has the burden of establishing that 'the words and expressions used not only are susceptible of that construction but that it is the only construction that can fairly be placed thereon.' *Hartol Products Corp. v. Prudential Ins. Co.*, 290 N.Y. 44, 49, 47 N.E.2d 687, 690, supra."

*Bronx Sav. Bank v. Weigandt*, 1 N.Y.2d 545, 551–52, 154 N.Y.S.2d 878, 882–83, 136 N.E.2d 848, 851 (1956). See *Vargas v. Insurance Co. of N. Am.*, 651 F.2d 838, 839 (2d Cir. 1981).

Here, the parties assert varying interpretations of the policy. That is not surprising since not only do courts consistently reach divergent conclusions when construing the CGL policy occurrence clause, but also the insurance industry is presently considering clarification of coverage concepts by revising the CGL policy. Affidavit of John Saulino, Exh. 1. Long ago the New York Court of Appeals established that determination of contractual ambiguity is a matter of law for the court to decide irrespective of conflicting judicial precedent. *Hartigan v. Casualty Co. of Am.*, 227 N.Y. 175, 179–80, 124 N.Y.S.2d 789, 790 (1919). Accepting this responsibility, the Court concludes that in the context of injuries which may remain latent for years subsequent to inception, reasonable persons may reasonably differ as to the meaning of the occurrence clause in Home's policies. Therefore, the principle of *contra proferentum*, which has "special vigor when applied to a [CGL] policy," *National Screen Serv. Corp. v. United States Fidelity & Guar. Co.*, 364 F.2d 275, 279 (2d Cir.), *cert. denied*, 385 U.S. 958, 87 S.Ct. 394, 17 L.Ed.2d 304 (1966), must be applied in the present case.

■ Citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317 (2d Cir. 1975), and *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388 (2d Cir. 1976) (*per curiam*), Home argues that disputed factual issues concerning meaning, intent and application of the occurrence clause preclude summary judgment. However, *Heyman* and *Home Insurance* simply establish fundamental summary judgment principles, application of which is not antithetical to the Court's present decision. While a court cannot try issues of fact on a motion for summary judgment, it is the burden of the opposing party to definitely show that such issues exist. The opponent cannot rely on conclusory statements, but must set forth "specific facts" which demonstrate a genuine need for trial. Absent such a presentation, the Court cannot simply adopt bald assertions of the existence of triable issues. Yet Home has proffered not a scintilla of evi-

dence in the form required by Rule 56 which raises a triable issue as to the parties' intent or any other material fact. Where the opposing party fails to show the existence of a genuine dispute over the underlying material facts, it cannot prevent summary judgment merely by asserting its preferred construction of a contract.

Moreover, *Heyman* and *Home Insurance* did not purport to apply the above-delineated established principles of New York law, *viz.*, that ambiguity *must* be resolved against the insurer, and that the construction sought by the insurer, to prevail, must be the *only* reasonable interpretation of the policy language. Under the *Erie* doctrine, we are obligated to follow these principles of substantive law.

Further, under New York law, unless disputed evidence is presented as to the parties' contractual intent, ambiguity in an agreement is not an issue of fact capable of preventing summary judgment, but a question of law for the court to resolve.[4] In *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 344 N.Y.S.2d 925, 298 N.E.2d 96 (1973), the New York Court of Appeals explained the applicable principles where contractual ambiguities arise in the context of summary judgment motions. Holding that no triable issue was raised by conclusory averments that subsequent agreements were not intended to discharge matured obligations under a prior agreement, the court stated:

> "The test on summary judgment is whether the issue is one of law or of fact (CPLR 3212, subd. [b]). The courts have declared on countless occasions that it is the responsibility of the court to interpret written instruments (4 Williston, Contracts, § 601, *supra*). The problem of analysis of the instrument is to determine 'what is the intention of the parties as derived from the language employed' (*id.*, § 600, at p. 280). Thus where a question of intention is determinable by written agreements, the question is one of law, appropriately decided by an appellate court (see *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 126 N.E.2d 271, *supra*), or on a motion for summary judgment. Only where the intent must be determined by disputed evidence or inferences outside the written words of the instrument is a question of fact presented (*O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 280 N.Y. 50, 56, 19 N.E.2d 676, 679). (Restatement, 2d, Contracts, T.D. No. 5, § 238, esp. Comment d.)"

32 N.Y.2d at 291, 344 N.Y.S.2d at 930, 298 N.E.2d at 100.

The validity of the *Mallad* analysis in insurance coverage disputes is verified by the decision in *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973). Addressing the issue whether the construction of an automobile insurance policy is a question for a jury or the court to decide, the Court of Appeals noted that the fundamental objective is to determine the parties' intention from the language employed. Adopting the analysis in *Mallad*, the court held that where "there is no relevant evidence extrinsic to the insurance policy bearing on the intention of the parties at the time of its execution," equivocality in the policy must be resolved as a question of law. 33 N.Y.2d at 172, 350 N.Y.S.2d at 898, 305 N.E.2d at 909. Accordingly, after construing the "occurrence" language in the policy, the Court of Appeals granted the appellant's motion for summary judgment.

Neither party here has offered extrinsic evidence on their contractual intent; hence no factual dispute exists which prevents

---

**4.** The determination whether contractual intent is a factual or legal question is governed by the substantive law of contracts. It is in no sense a "procedural" question even though it is critical in ascertaining the propriety of summary judgment under F.R.Civ.P. 56. Referring to the policies underlying the *Erie* doctrine, "discouragement of forum-shopping and avoidance of inequitable administration of the laws," *Hanna v. Plumer*, 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1965), the instant circumstances provide no justification for not following New York law on this issue, particularly since the application of State law will leave inviolate the applicability and operation of the federal rules of procedure.

operation of *contra proferentum* in the circumstances of this motion. Nor does Home's contention that lack of opportunity for discovery has precluded it from marshaling evidence as to Schering's intent, see Affidavits of Diane S. Wilner, compel a different result. First, Schering produced more than 74,000 pages of documents in response to Home's discovery request, including all of Schering's insurance department files relating to the policies at issue. Affidavit of Edwin J. Wesely ¶ 4. Second, Home fails to explain why it needs discovery to determine Schering's intent when its own files should be an equally beneficial source of materials indicating the parties' positions during negotiation and execution of the policies. Third, insofar as Schering's understanding might have been recorded, it comprises only one-half of the intention or agreement of the parties; yet Home has offered no extrinsic evidence as to its own intention. In the latter regard, the Court notes that summary judgment is appropriate for the insured where policy language has been drafted in a manner which fails to unambiguously indicate to "a person of ordinary business intelligence" the coverage intentions of the insurer. *Government Employees Ins. Co. v. Ziarno*, 273 F.2d 645, 649 (2d Cir. 1960).

■ Turning to the language of the policies, as before noted, the contractual definition of "occurrence" ("an ... event ... which ... results in personal injury ... during the policy period") lies at the core of the present controversy. Specifically, judicial interpretation of the term "results" will resolve the essential issues of this litigation and clarify the respective rights and liabilities established by the insurance agreements in question. The dictionary definition of the verb "results" is "to arise as a consequence." Webster's New Int'l Dictionary 2126 (2d ed. 1959). Thus, fairly read, the occurrence clause predicates coverage upon an event from which personal injury arises as a consequence during the policy period. Unquestionably, Schering could have reasonably expected such coverage. As a drug manufacturer, Schering purchased insurance to negate the risk of loss from prospective personal injuries arising during the policy periods. Yet, the verb "arises" has two distinct meanings in this context: an injury may internally originate or come into being at a certain point in time, and it may also visibly present itself or come into notice at a subsequent point.[5]

Proximity of origin and notice of injury will vary according to the nature of the harm. Some personal injuries covered by the policies at issue involve simultaneous notice and origin of harm, such as mental anguish, shock and humiliation. But years may separate inception and manifestation of other covered harms, such as bodily injury or disease, particularly carcinomas. As the gap widens, either origin or notice may necessarily fall outside the purchased period of insurance. To uphold the policies' purpose of indemnification and the reasonable expectations of the insured, the Court concludes that either inception or discovery of injury may trigger Home's coverage obligations.

Accordingly, Schering's motion for summary judgment is granted. The Court hereby declares that Home must indemnify Schering for the latter's excess liability on account of personal injuries caused by prenatal exposure to dienestrol from which personal injury unexpectedly arises, *i.e.*, either originates or is discovered by the individual claimant, during the policy periods commencing August 30, 1966 and ending February 7, 1976.

The parties are directed to submit an appropriate form of judgment within thirty days from the date hereof.

SO ORDERED.

---

**5.** Webster's New Int'l Dictionary 148 (2d ed. 1959) defines "arise" as follows:

"arise ... 2. To spring up; originate; to come into being or notice; to become opera-tive, sensible, visible, or audible; to present itself."