SANDOZ, INC., Plaintiff,

v.

EMPLOYER'S LIABILITY ASSURANCE CORP. (presently known as Employer's Commercial Union Insurance Co.); Employer's Commercial Insurance Co.; and Hartford Accident & Indemnity Co., Defendants.

Civ. A. No. 81–497.

United States District Court,
D. New Jersey.

Jan. 6, 1983.
As Amended Jan. 13, 1983.

Shanley & Fisher by Michael J. Lunga, Newark, N.J., for plaintiff.

Martino & Mosolino by Michael F. Martino, Florham Park, N.J., for defendants Employer's Liability Assur. Corp. and Employer's Commercial Ins. Co.

Lum, Biunno & Tompkins by William C. Carey, Newark, N.J., for defendant Hartford Acc. & Indem. Co.

## OPINION

SAROKIN, District Judge.

Despite the advances in science and technology, certain products thought to be safe have proved to be dangerous, and in some instances, deadly. The effects may not be known until years and even generations later. Many such products were placed in the stream of commerce in the honest belief that they were safe. Their sale frequently, but not always, followed careful research and development.

As a result, the concept of strict liability has arisen. It is predicated upon a rational allocation of the risk. As between the producer and the innocent consumer, the producer, even if careful and cautious, has been required to bear the losses sustained. Implicit in its sale of a product in the marketplace is the assurance that it is safe to use. If that assurance proves to be wrong and the consumer has been injured, absent an adequate warning, the manufacturer of the dangerous or defective product is held responsible.

Industry, in recognition of the obligation imposed upon it, has sought means to protect itself against such claims and invariably has relied upon insurance. With the growth of claims that have taken years to manifest themselves and the size of the class of potential claimants, many insurance companies faced with such claims have run for cover rather than coverage. The small print suddenly has been magnified, and insurance companies can be seen scurrying about the courts of this country in search of ways to avoid honoring their policies. That is not to say that all efforts at avoidance are without merit, but there is a direct relationship between the potential size of the claims and the inventiveness of the carriers in denying coverage.

The court recognizes the potential financial devastation faced by many insurance companies if required to provide coverage for these long, undetected, festering injuries. However, neither the number of claims nor their total value is a valid consideration in determining the existence of coverage. Indeed, in the case of insurance companies, as compared to those that they insure, this is the very risk which they undertook. It is the foundation and justification for their existence. The presumption should be in support of coverage, rather than its rejection. How the insurance carriers deal with these mass claims is a valid

test of the integrity of the insurance industry.

STATEMENT OF FACTS

This action is based on a series of comprehensive general liability (hereinafter "CGL") insurance policies issued to Sandoz by the defendants, Employer's Liability Assurance Corporation, Employer's Commercial Union Insurance Company and Hartford Accident & Indemnity Company, over a period of more than twelve years. Plaintiff, a Delaware corporation with its principal place of business in East Hanover, New Jersey, was known prior to July 1, 1974 as Sandoz-Wander, Inc. Sandoz is engaged in the manufacture and sale of pharmaceutical products, including the prescription drugs Mellaril and Sansert.

Defendant, Employer's Liability Assurance Corporation, was an insurance company incorporated in the State of Massachusetts whose principal place of business was located in Boston, Massachusetts. After first changing its name to ELAC Insurance Company, Ltd. it later merged with Employer's Commercial Union Insurance Company (hereinafter "Commercial Union"), also a Massachusetts insurance company with its principal place of business in Boston.

Defendant Hartford Accident & Indemnity Company is an insurance company incorporated in the State of Connecticut whose principal place of business is located in Hartford, Connecticut.

From January 1, 1963 through March 23, 1975 Sandoz obtained successive policies of insurance providing product liability coverage. These policies were issued by Commercial Union for periods extending from January 1, 1963 through January 1, 1973 and by Hartford for periods extending from January 1, 1973 through March 23, 1975. Thereafter plaintiff had no insurance which would compensate it for the damages sought in this action. Otherwise virtually identical with the Commercial Union policies, the Hartford policies had a $50,000.00 deductible only as to the drug Sansert.

Each of these policies was of the standard CGL type. The coverage language in these policies was very similar and stated typically:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... to which this insurance applies, caused by an occurrence ...

The insuring agreement stated further that "[t]his insurance applies only to bodily injury ... which occurs during the policy period." "Bodily injury" was defined as "bodily injury, sickness or disease sustained by any person" and "occurrence" was defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury ... neither expected nor intended from the standpoint of the insured."

A. *Daniels' Claim*

On June 23, 1978, Zack L. Daniels and Pearl Daniels, his wife, instituted suit in the United States District Court for the Northern District of Florida against Sandoz and a co-defendant physician Brooks. The complaint alleged that Mr. Daniels had ingested the Sandoz drug Mellaril from sometime in 1965 until late 1975, and as a result thereof, developed tardive dyskinesia, the symptoms of which were brought to defendant Brooks' attention in early 1975. The complaint further alleged that not until Mr. Daniels consulted a physician other than Dr. Brooks in September 1975 was his condition correctly diagnosed.

Hartford entered a defense for Sandoz in the *Daniels* matter with a reservation of its rights and notified the insured that it would only contribute to any judgment or settlement a pro-rated portion based on the length of its policy period, as compared to the total duration of the exposure to the drug Mellaril.

Commercial Union was advised of the coverage problem concerning the *Daniels* claim against Sandoz, but refused to participate in the defense and denied any obligation to contribute to any judgment or settlement on the basis that no injury had occurred during its policy period.

In September of 1980 the *Daniels* case went to trial. The suit was then settled as against Sandoz for the sum of $75,000.00. Adhering to its earlier position, Hartford was only willing to contribute twenty percent of any settlement reached. Sandoz, specifically reserving its rights as against all of the defendants herein, agreed to contribute the remaining eighty percent. Thus, Sandoz paid $60,000.00 out of its own funds to settle the *Daniels* case.

While there is no dispute among the parties that outward manifestation of Daniels' disease occurred well before the uninsured period, there is disagreement as to whether manifestation occurred during Commercial Union's policy period or during Hartford's policy period. For purposes of this motion, however, the parties have agreed to limit the issues to the interpretation of the policy language, leaving the determination, if necessary, of the factual question of the exact date of manifestation for another day.

### B. *Huggs' Claim*

On March 15, 1976, Joseph Wayne Huggs brought suit in the District Court of Harris County, Texas, against a physician and a pharmacy alleging injury following ingestion of the Sandoz drug Sansert for several years prior to August 1975. It was further alleged that, as a result of ingesting Sansert, Mr. Huggs became seriously ill and in August of 1975 was diagnosed to be suffering from "granuloma of the left lower lobe of lung" and from "fibrous plakue of diaphragm" for which he underwent surgery on August 29, 1975. The *Huggs* complaint was amended on August 18, 1976 to name Sandoz and another pharmacy as additional defendants. The complaint alleged ingestion of the drug from early 1965 until August of 1975. Neither the pleadings nor the pretrial discovery in the *Huggs* case establish the appearance of outwardly visible clinical symptoms prior to March 23, 1975, the expiration date of the last Hartford policy.

Again Hartford entered a defense for Sandoz paying for all fees and disbursements and notified the insured that it would only indemnify Sandoz on a pro-rated basis. Likewise, Commercial Union declined to become involved on the basis that no bodily injury had occurred during its policy period.

The *Huggs* lawsuit was settled as against Sandoz for the sum of $10,000.00. As a result of the deductible clause with regard to Sansert in the Hartford policies and the refusal of Commercial Union to become involved in the *Huggs* matter, the entire settlement amount was paid by Sandoz.

In both the *Daniels* and the *Huggs* litigations counsel for Sandoz was selected by Hartford and no party to the present action disputes the fairness and reasonableness of either the settlement amounts paid to the claimants or the legal fees and disbursements incurred by the defense.

Plaintiff Sandoz brought this action to recover on the policies issued by Hartford and Commercial Union. In part, plaintiff seeks a declaration of the respective obligations of these insurers to indemnify it for the amounts paid in settling the *Daniels* and *Huggs* suits. Sandoz now moves for partial summary judgment, declaring that both insurers are jointly and severally liable to Sandoz to the full extent of its losses. Commercial Union cross-moves for partial summary judgment, for a declaration that only the insurer whose policy is in effect at the time the injury is manifested is liable under these policies. Defendant Hartford seeks partial summary judgment dismissing Count IV of the complaint, which seeks punitive damages against Hartford.

The parties do not agree on the nature of the injurious process undergone by claimants Daniels and Huggs. But they have agreed to set aside for the time being their dispute as to the exact dates of ingestion and/or manifestation and to submit for adjudication the single question of proper interpretation of the policy language.

The jurisdiction of the court is based on 28 U.S.C. § 1332.

### *Justiciability*

■ The exact nature of the injurious processes experienced by claimants Daniels

and Huggs has not been determined, and is in dispute among the parties to this litigation. Neither have the exact dates of manifestation of these injuries been determined. These factual questions will have to be resolved before any final determination is made of the liability of each insurer to indemnify Sandoz. Plaintiff contends, and this court agrees, that this controversy is justiciable and ripe for partial summary judgment at this time, despite the presence of these factual issues that will eventually require resolution.

This court has jurisdiction to determine the rights and duties of these parties under their contracts by declaratory judgment if there is an "actual controversy." 28 U.S.C. § 2201 (Supp.1980). The test of justiciability under this statute is "... whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The facts of this case show that such a substantial controversy is present here. As a result of the settlements of the *Daniels* and *Huggs* suits, Sandoz has incurred substantial costs for which it contends it is entitled to indemnification from defendants. The legal interests of defendants are clearly adverse to those of plaintiff, and the controversy is sufficiently immediate.

In *ACandS, Inc. v. Aetna Casualty and Surety Co.*, 666 F.2d 819 (3d Cir.1981), an insured brought a suit seeking a declaration of the respective obligations of several insurers to defend several underlying suits brought against the insured and to pay any resultant judgments. The Third Circuit Court of Appeals found the case to be justiciable, because it presented questions of the scope of the insurance coverage independent of the exact amounts of liability that would be determined in the underlying suits. In that case, as in the one presented here,

[t]he factors that will determine the relative duties and benefits under the insurance contracts are independent of the underlying claims and are being presented in an adversarial context by parties with adverse interests. 666 F.2d at 822–3.

Plaintiff seeks a declaration of the extent of coverage of several insurance policies. Although the exact progress of each injury is not known, Sandoz has incurred costs because of its settlements in the underlying *Huggs* and *Daniels* cases. The present issue is sufficiently concrete and immediate, and the interests of the parties sufficiently adverse, to present a justiciable controversy.

In addition, the question presented on this motion is ripe for determination by summary judgment. A grant of summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The issue presented here is one of contract interpretation. Plaintiff seeks a declaration by this court of the trigger event and the scope of coverage of several similar insurance policies in cases where the underlying claim alleges injury from long-term ingestion of a prescription drug. Plaintiff does not seek a factual determination of the allocation of coverage between the defendant insurers in this motion. The facts relevant to the interpretation of the contracts are not in dispute. Thus, there is no issue of fact material to the resolution of the limited question presented here, and the issue is ripe for summary judgment.

*Interpretation of the Contracts*

The insurance policies issued by Hartford and Commercial Union were essentially identical, except that the Hartford policy contained a $50,000 deductible provision as to the drug Sansert only. The policies were standard comprehensive general liability policies with clauses providing that:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury ... to which this insurance applies, caused by an

occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury . . . .[1]

The policies further provided that "[t]his insurance applies only to bodily injury or property damage which occurs during the policy period . . ." In their respective sections of definitions, the policies provided that

"bodily injury" means bodily injury, sickness or disease sustained by any person; "occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

The controversy among the parties revolves around the meaning of "bodily injury" under these policies. Commercial Union's position is that "bodily injury" requires an outward physical manifestation of a disease, and hence, liability under these policies is not triggered until symptoms capable of diagnosis are produced. Commercial Union denies all liability under the policies because the injuries here involved were not manifested during the periods of time when its policies were in effect. Commercial Union's position is that the insurer who is on the risk (whose policy is in effect) when the injury manifests itself is wholly liable to indemnify and defend the insured's liabilities.

Hartford's position is that "bodily injury" includes internal injuries which cannot be seen from the outside, and which may not be diagnosed for some time after they occur. Under this theory, if exposure to the drugs caused bodily injury that only later manifests as a disease that can be diagnosed, each insurer who had a policy in effect during the exposure period is liable for part of the damage. Hartford argues that liability among insurers should be apportioned on a pro-rata basis, with each insurer liable for its pro rata share based on the time its coverage was in effect in relation to the total time of exposure.

Sandoz agrees with Hartford's interpretation of "bodily injury" under these policies. But it contends that no pro rata division of liability is appropriate. Sandoz contends that all insurance companies that were on the risk for any period of time during exposure are jointly and severally liable for the full extent of the losses suffered by the insured. Under this theory, since both defendants were on the risk for a part of the time of exposure, they would each be liable to Sandoz for the full amounts of the settlements, and would have to determine between them the relative amounts of contribution.

*Choice of Law*

The court must first resolve the question of what law to apply to these transactions. In this diversity case the court must apply the conflict of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In New Jersey the courts ordinarily apply the law of the place of the contract to determine the rights and liabilities of the parties under an insurance contract, unless an evaluation of significant competing interests compels a different result. *State Farm Mutual Automobile Insurance Co. v. Simmons' Estate*, 84 N.J. 28, 417 A.2d 488 (1980).

Sandoz is a Delaware corporation with its principal place of business in New Jersey. Commercial Union is a Massachusetts corporation with a principal place of business in Massachusetts. Hartford is a Connecticut corporation with its principal place of business in Connecticut. The policies that are the subject of this litigation were all issued to plaintiff in New Jersey. There is no reason to displace the normal rule of the place of the contract in this case. The court will apply New Jersey law.

However, the courts of New Jersey have not resolved the precise issue before this

1. This language is taken from Hartford Policy No. 18 C F11303E, effective on January 1, 1973. All of the policies contained substantially simi-

lar language and the parties agree that they should be interpreted similarly.

court, of whether to apply an 'exposure' theory or a 'manifestation' theory to determine insurance coverage. The task of the court then is to determine how the Supreme Court of New Jersey would decide this issue, were it before that court today. In determining this issue this court has sought guidance from the decisions of other districts and circuits that have considered the problem.

The court will apply New Jersey's general rules of construction of insurance contracts to decide this case. Under New Jersey law courts must protect the insured to the full extent that the language of the policy allows. *Mazzilli v. Accident & Casualty Insurance Co.*, 35 N.J. 1, 7, 170 A.2d 800 (1961). If the language of the policy will support two interpretations, one favorable to the insurer and the other favorable to the insured, the one maximizing coverage must be applied. *Id.* But when the policy language is clear and unambiguous, the court may not rewrite a better contract of insurance, but must enforce the agreement as made by the parties. *Deodata v. Hartford Insurance Co.*, 143 N.J.Super. 396, 401, 363 A.2d 361 (Law Div.1976), *aff'd*, 154 N.J. Super. 263, 381 A.2d 354 (App.Div.1977).

*Discussion*

Comprehensive general liability policies are relatively simple to apply with regard to a single accident which causes an obvious and unmistakable infirmity. The problem arises when a disease at issue is insidious, and actually begins long before it can be discovered from external observation of the patient. This is not to say that these diseases do not have deleterious effects prior to this time; indeed, such diseases may cause small but definite injuries to the body until the cumulative effect is noticeable externally. The courts that have considered this issue thus far have dealt primarily with problems of the asbestos industry, although there have been some cases involving drugs. The basic division among the courts is between the "manifestation" approach and the "exposure" approach.

It has been clinically proven, at least to the satisfaction of several courts, that asbestos causes injuries to tissues from the time when the victim is first exposed to the fibers, even though external symptoms may not appear for many years. Several of the courts that have considered this question have availed themselves of this proven clinical background on the etiology of the disease, an advantage that this court does not have in this case. The court does not know the exact progression of the diseases alleged in the *Daniels* and *Huggs* complaints, although it is known that these diseases became apparent after long periods of ingestion of the drugs. This limited knowledge is sufficient to permit interpretation of the policies here involved. The court may seek guidance from the asbestos cases, which involved diseases that also became apparent long after periods of exposure to the injurious substance.

In *INA v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980), *aff'd on rehearing*, 657 F.2d 814 (1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), an asbestos case, the court construed comprehensive general liability policies that are in all pertinent respects similar to the policies involved in this case. The court, in part, applied New Jersey law to determine whether the "exposure" theory or the "manifestation" theory would determine the extent of coverage of the policies. The court affirmed the district court determination that the "exposure" theory would be applied. The court noted that cumulative disease cases are very different from ordinary accident or disease cases. One difference is that the time when these diseases manifest themselves is not the time when the diseases occurred. The court then found the terms "bodily injury" and "occurrence" to be inherently ambiguous when applied to these diseases. The court applied New Jersey law to broadly construe the policies to promote coverage and adopted the exposure theory. The court further reasoned that the exposure theory was best suited to the language of the policies.

[W]e need only look at the definition of "bodily injury" in the policy. Bodily injury is defined as "bodily injury, sickness or

disease . . ." It is tautological that bodily injury can be 'bodily injury' and is not necessarily just a 'disease.' *Id.* at 1222. The court concluded ·that "bodily injury" should be construed to include tissue damage which takes place upon initial inhalation of asbestos. *Id.* at 1223. The court rejected the manifestation theory, finding that the policies protected against the occurrence of any bodily injury, not limited to the time when that injury becomes compensable because of manifestation.

The Fifth Circuit Court of Appeals, in *Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), another asbestos case, adopted the exposure theory by relying on the reasoning of the court in the *Forty-Eight Insulations* case.

The District of Columbia Circuit Court of Appeals recently adopted the exposure theory in *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C.Cir. 1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), another case involving asbestos and comprehensive general liability policies. The court concluded that each insurer on the risk between the initial exposure and the manifestation of the disease was liable to the insured. The exposure to asbestos, as part of an injurious process, was sufficient to constitute "injury" under the policies, regardless of whether any immediate and discrete injury occurred. The court found that inhalation exposure, exposure in residence (subsequent development of the disease after inhalation) and manifestation of the disease all triggered coverage under the policies. "Bodily injury" was interpreted to mean "any part of the single injurious process that asbestos-related diseases entail." *Id.* at 1047. The *Keene* court did not adopt the view of the Sixth Circuit Court of Appeals in *Forty-Eight Insulations* that asbestosis was a series of bodily injuries culminating in the disease. *Id.* at 1044 n. 20. It instead characterized the disease as a single injury that occurs over an extended period of time. Under this view of the disease, liability is triggered by coverage during any time period included in the process of the disease, from initial exposure to later manifestation.

The only Court of Appeals that has adopted the "manifestation" theory thus far is the First Circuit. In *Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 682 F.2d 12 (1st Cir.1982), another asbestos case, the court held that "a disease 'results' under the policies when it becomes clinically evident, that is, when it becomes reasonably capable of medical diagnosis." (footnote omitted) 682 F.2d at 25. The court concluded that the term "bodily injury" in the policies referred only to injuries caused by external violence or impact. The court reasoned that tiny, sub-clinical insults to tissue are not considered to be injury or disease as those terms are commonly used. *Id.* at 19–20. Further, the circumstances surrounding the acquisition of insurance convinced the court that the parties had intended to apply a manifestation theory. Insurance was first purchased in 1968, and continued in increasing amounts throughout the 1970's, even though the manufacturer ceased production of asbestos products in 1971 or 1972. From this the court deduced that, to the insured, manifestation coverage would have been more desirable than exposure coverage, since exposure to the products undoubtedly declined once production ceased. *Id.* at 23. Thus, the court followed the principle of interpretation that insurance contracts are to be construed in favor of the insured.

In *Schering Corp. v. The Home Insurance Co.*, 544 F.Supp. 613 (E.D.N.Y.1982), the court considered insurers' liabilities for injuries caused by ingestion of the drug DES under New York law. The court recognized that internal injuries were covered by the policies, and focused on the meaning of the requirement of the policies that injuries result during the policy period. The court concluded that the injury results either when it originates internally or when it is discovered by the claimant. The court found that Schering could have reasonably expected coverage for all personal injuries that arose during the policy periods.

This court agrees with the Sixth Circuit Court of Appeals that by defining bodily injury as "bodily injury, sickness or disease," the policies isolate injuries from diseases. The policies do not require that injuries to the body be observable or manifest in any way to trigger liability. Internal tissue damage is bodily injury, even before it later manifests as a disease that can be medically diagnosed. A reading of the policies which gives effect to all of the language and that maximizes coverage results in an interpretation which covers internal, non-observable tissue damage.[2] The court in *Forty-Eight Insulations* applied New Jersey law, the law that this court must apply in this case.

This court also recognizes the importance of the requirement in the policies that injury result in the policy period. The damage to tissues must occur during the time a policy was in effect to trigger liability under that policy. Ingestion of the drug during the policy period is not an event that alone can trigger liability. It is bodily injury, resulting during the policy period, that is the event that triggers liability. Ingestion of the drug, the "occurrence" that causes the injury, need not fall within a policy period for that injury to be covered by the policy. *Keene*, 667 F.2d at 1040. If no damage has occurred, there is no liability under the policy.

The theory, as developed in *Forty-Eight Insulations* is not inconsistent with the result reached here. The exposure theory there rested on the uncontroverted medical evidence that "tissue damage takes place at or shortly after the initial inhalation of asbestos fibers." 633 F.2d at 1222. Thus, there was a basis for equating tissue damage to exposure to asbestos. Here, we do not know the progress of the diseases caused by the drugs, so there is no basis for equating tissue damage to ingestion of the drugs. To the extent that the exposure theory triggers liability when tissue damage occurs, this court is in agreement with that theory.

This interpretation of the CGL policies is supported by decisions of the courts of New Jersey holding that the trigger of liability under these policies is an injury during the policy period, and not a negligent act during the policy period that later caused the injury. In *Middle Department Inspection Agency v. The Home Insurance Co.*, 154 N.J.Super. 49, 380 A.2d 1165 (App.Div.1977), *cert. denied*, 76 N.J. 234, 386 A.2d 858 (1978), the plaintiff insured was sued for negligent inspection of a building in 1970. Faulty wiring caused a fire in 1973. Defendant Home Insurance Co. insured the plaintiff in 1970, but not in 1973, under a general liability policy. The court found that the defendant was not liable because no damage occurred during its policy period. The basis for the decision was that "in order for an occurrence to qualify for coverage under this policy the damage must occur within the policy period." *Id.* at 53, 380 A.2d 1165. In *Deodata v. Hartford Insurance Co.*, 143 N.J.Super. at 396, 363 A.2d 361, plaintiff contractor sought declaration of liability of defendant insurer for negligent construction of a roof, where the negligence occurred during the policy period, but the damage resulted after the policy period. The court found that the occurrence triggering liability was the destruction of the roof, not the negligent construction of the roof some years earlier. These cases indicate that under New Jersey law, a negligent act, or exposure to a harmful substance is not sufficient to trigger liability. Liability occurs only when some damage results during the policy period. This court's decision that liability is triggered when bodily injury, in the form of tissue damage, results during the policy period, is consistent with New Jersey law.

The court rejects the position that manifestation of the disease is a separate and independent trigger of liability under these policies. The policies refer to the time when the injury results, not the time when

---

**2.** In addition to tissue damage, bodily injury includes any pathological change to the human organism, including, but not limited to, injury to brain matter, blood and other fluids, cells, nervous system and bones.

the injury becomes discoverable or recognizable as a specific disease. Like all other insurers, the insurer on the risk at manifestation will be liable if bodily injury occurred during its policy period.

■ For the foregoing reasons, the court rejects the manifestation theory. The court adopts the exposure theory to the extent that it is consistent with this opinion; liability is triggered not by exposure, but by bodily injury occurring during the policy period. It may be a misnomer to label this approach the "exposure" theory. A more accurate label would be the "injury theory."

### Extent of Liability

■ Liability under the policies is contractual. Each company should be fully liable for the risk it has undertaken irrespective of the existence of prior or subsequent coverage by other carriers. In determining the extent of liability the existence of other coverage should be treated no differently than if there were no other coverage and the plaintiff were self-insured for those later or earlier periods of time.

Sandoz urges the court to adopt the approach taken in *Keene,* which makes each insurer whose policy is triggered liable for the whole of the injury. Each insurer was there made jointly and severally liable to the insured, and the insurers were left to determine amounts of contribution among themselves. Hartford urges the court to follow the approach of *Forty-Eight Insulations,* which apportioned liability on a pro rata basis. Each insurer was there liable for its pro rata share of the damages, based on the amount of time that insurer was on the risk in relation to the total period of exposure to the harmful substance.

Based upon the language of the policy, each carrier is liable for the entire injury sustained during the policy period. It is only where the evidence cannot specifically identify and quantify the injury actually sustained during the policy period that some fair and appropriate means of allocation must be developed. A carrier would not normally be held liable for injuries sustained before its coverage commenced or after it terminated.

Therefore, in this respect and as to this issue a factual record must be developed. If the medical evidence cannot differentiate between the various periods of coverage, then and only then is it appropriate to consider an alternate means of allocation. In such circumstances the court agrees with the approach adopted in *Keene.* The contract of insurance contemplated coverage for the injuries sustained. If injuries were sustained during the policy period and there is no way of distinguishing those injuries from ones sustained prior or subsequent thereto, then the insurer would be liable for the full amount. In those circumstances the liability of each such insurer would be joint and several.

The court rejects the automatic pro rata allocation adopted in *Forty-Eight Insulations* in a claim by the insured. It may be an appropriate standard in considering claims among the insurers, but not in considering a claim by the insured. The pro rata method is an arbitrary one that assumes that the occurrence of bodily injury mirrors exposure to the harmful substance.

The court adopts an approach that makes each insurer liable to indemnify for the damages resulting from the bodily injury that occurred during its policy periods. This will require evidence of the progress of the disease to determine when tissue damage occurred. If medical evidence is able to establish this, each insurer will be liable only for the damage that occurred during its policy periods from ingestion of the drug. The liability of any insurer should not be affected by the existence or non-existence of any prior or subsequent coverage, except to the extent that such other coverage might provide for contribution or credits in accordance with the terms of the policy.

Some hypothetical examples may help to illustrate: Hypothesize a two-year period of drug ingestion by a claimant; insurer A's policy covers the first year and insurer B's policy covers the second year. If the entire injury was incurred in the first year and

the medical evidence indicates that there was no increase or aggravation in the second year, then only insurer A should be obligated to indemnify the manufacturer. If the injury was aggravated during the second year, then insurer B should be liable to indemnify to the extent of the aggravation and insurer A would be liable for the damages sustained in the first year. If there was no way of allocating the damages caused in the first and second years, then insurers A and B would each be liable for the total damages sustained. Their liability would be joint and several as to the insured. Under such circumstances, where medical evidence cannot establish the progress of the disease, as between the companies a pro rata allocation and contribution would be appropriate. However, the right to such contribution does not reduce their respective obligations to their insured.

### Duty to Defend

The policies all contained provisions stating a broad duty to defend suits:

... the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, ...

The insurer's duty to defend is directly related to the coverage afforded by the policy. *Deodata,* 143 N.J.Super. at 400, 363 A.2d 361. The duty to defend arises when the complaint states a claim constituting a risk insured against. *Id.* The test is to examine the complaint and determine whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment. *Id.* at 401, 363 A.2d 361. If the cause of action pled is one which, if sustained, will impose a liability under the policy, the insurer must defend. *Danek v. Hommer,* 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), *aff'd,* 15 N.J. 573, 105 A.2d 677 (1954).

If the complaint alleges a progressive, gradual, or cumulative disease resulting from long periods of ingestion of a drug, liability could result from all policies in effect during the entire progress of the disease. The complaint should be read to allege that bodily injury occurred during this entire period. Thus, each insurer that had a policy in effect for any part of this time period has a duty to defend the suit, and is liable for the entire costs of defense. When more than one insurer was on the risk during this period, they are jointly and severally liable to the manufacturer for costs of defending the suit.

### Punitive Damages

Hartford has also moved for summary judgment on the fourth count of the complaint, which seeks punitive damages against the defendants for their conduct vis-a-vis Sandoz. Sandoz alleges that the conduct "has been outrageous and has been wanton, willful, malicious, and against public policy." Complaint at ¶ 36. As with the other issues in this case, the court is bound to apply New Jersey law to this matter.

"In the absence of exceptional circumstances dictated by the nature of the relationship between the parties or the duty imposed upon the wrongdoer, the concept of punitive damages has not been permitted in litigation involving breach of a commercial contract." *Sandler v. Lawn-A-Mat Chemical & Equipment Corp.,* 141 N.J.Super. 437, 449, 358 A.2d 805 (App.Div.), *cert. denied,* 71 N.J. 503, 366 A.2d 658 (1976). See also *First National State Bank v. Commonwealth Federal Savings and Loan Association,* 455 F.Supp. 464, 471 (D.N.J.1978), *aff'd,* 610 F.2d 164 (3d Cir.1980). However, one of the exceptions noted in Sandler was an action involving a fiduciary relationship, and Sandoz contends that such a relationship exists here between it and its erstwhile insurers.

The relationship between an insurer and its insured has been held to be fiduciary, but only in limited circumstances. "[T]he relationship of the company to its insured regarding *settlement* is one of inherent fiduciary obligation." *Rova Farms Resort v. Investors Insurance Co.,* 65 N.J. 474, 492, 323 A.2d 495 (1974) (emphasis added). This is because as regards settlement, the company has made itself its insured's agent,

proscribing the insured from settling in its own behalf. See also *Lieberman v. Employers Insurance of Wausau,* 84 N.J. 325, 419 A.2d 417 (1980).

It should be noted that this motion is made solely on behalf of Hartford. Plaintiff has shown the court no reason why Hartford's actions should be regarded as outrageous, or even how those actions involved a fiduciary responsibility. "The mere presence of a fiduciary duty regarding one aspect of the insurance contract does not necessarily require that such a duty govern all aspects of the agreement." *Kocse v. Liberty Mutual Insurance Co.,* 152 N.J.Super. 371, 378–79, 377 A.2d 1234 (Law Div.1977). Hartford actually defended the suits against Sandoz, and there is no complaint with the handling of those defenses. What is left is merely a dispute as to the amount of money owed to Sandoz. This is a common question of contract interpretation, and not a situation where the insured's rights will be damaged or ignored because of some action of the insurer.

For these reasons, the court concludes that no fiduciary relationship was involved in the actions complained of by Sandoz, and certainly Hartford violated no fiduciary responsibilities by its actions. As the court in *Kocse* noted, "[d]espite this absence of a fiduciary duty on the part of the insurer, there is still the possibility that punitive damages might be awardable under certain circumstances." 152 N.J.Super. at 379, 377 A.2d 1234. No such aggravated situation has been shown in this case, and therefore the court will grant Hartford's motion. Punitive damages will not be allowed as to Hartford, and count four is dismissed as to that defendant only.

*Conclusion*

In essence, the court concludes that the obligation of an insurer to its insured is contractual. The contracts in issue provide for coverage during periods of injury and not manifestation. The matter shall be scheduled for trial to determine the factual issues as they apply to the foregoing legal conclusions, unless the parties can stipulate to such facts.

Counsel for Sandoz is directed to submit an appropriate form of order to the court.